# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
### SOUTHERN DIVISION

| | |
|---|---|
| New Beginning Sanctuary, A Missouri Not-For-Profit Corporation, Jaam Properties LLC, A Missouri Limited Liability Company, And Alon Fisch, An Individual, | Civil Action No. 23-cv-_____ <br><br> **Jury Trial Demanded** |
|         **Plaintiffs,** | |
| v. | |
| City Of Springfield, Missouri, A Missouri Municipal Corporation, | |
|         **Defendant.** | |

## <u>COMPLAINT</u>

NOW COMES Plaintiffs, NEW BEGINNING SANCTUARY, a Missouri not-for-profit corporation ("NBS"), and JAAM PROPERTIES, LLC, a Missouri limited liability company ("JAAM"), and ALON FISCH, an individual (collectively "Plaintiffs") by and through the undersigned attorneys for its second amended complaint against Defendant, CITY OF SPRINGFIELD, MISSOURI, a Missouri municipal corporation ("Defendant" or "City") alleges as follows:

## <u>INTRODUCTION</u>

1.     This matter arises pursuant to the Fair Housing Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 et seq. ("FHA") and the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA").

2.     The City prohibited Plaintiffs from operating a recovery home for residents in recovery from drug or alcohol addiction. The City claimed its zoning ordinance prohibited the

home from operating in an R-SF Zone because it is a "group home" under the City's zoning code and there is another "group home" located within ¼ mile. The City classified the home as a group house because the residents who occupy the home are in recovery from drug and alcohol abuse. This determination substantially limits the operation of supported housing for persons with the disability of substance use disorder from living, if not all, single-family residential districts in the City.

3.      The City denied Plaintiffs' request for a reasonable accommodation under the FHA and ADA.

4.      Accordingly, the City discriminated based on disability, including refusing to provide a reasonable accommodation, violating the FHA, 42 U.S.C. § 3604(f). Further, the City's zoning ordinance discriminates on its face and disparately impacts disabled individuals.

5.      Defendant's aforementioned actions now threaten Plaintiffs and the residents of the recovery home, who are disabled pursuant to the FHA and ADA, with eviction based on discriminatory means. To prevent such a result, Plaintiffs ask this Honorable Court for declaratory and injunctive relief to halt the City's discrimination based on disability in violation of the FHA and ADA, respectively. Additionally, Plaintiffs seek monetary damages, including compensatory and punitive damages, costs, and reasonable attorneys' fees.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343; 42 U.S.C. §§ 12133 and 12134; and 42 U.S.C. § 3613. Appropriate declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

7.      Venue is proper in the United States District Court for the Western District of Missouri, Southern Division, as all acts complained of occurred within this District.

2

## PARTIES

8. Plaintiff New Beginning Sanctuary is a Missouri not-for-profit corporation in Springfield, Missouri. It provides affordable recovery housing and support for individuals with disabilities, including those recovering from substance abuse and alcoholism. NBS operates the recovery home at issue in this litigation, located at 1635 W Katella Street, Springfield, Missouri ("*1635 West Katella House*").

9. Plaintiff JAAM Properties is a Missouri limited liability company in Springfield, Missouri. JAAM owns the home at 1635 W Katella Street, Springfield, Missouri, and leases it to NBS.

10. Plaintiff Alon Fisch is the founder and executive director of NBS Sanctuary.

11. Defendant is a political subdivision of the State of Missouri. Defendant is responsible for the acts of its agents and employees, including the Board of Zoning Adjustment, and the enactment, enforcement, and application of the City Code ("Code") of Springfield, Missouri.

## STATUTORY AND REGULATORY FRAMEWORK

12. In 1988, Congress amended the FHA to extend the guarantee of fair housing to disabled individuals. Congress also authorized the Secretary of the United States Department of Housing and Urban Development to promulgate regulations to implement the FHA.

13. Under the FHA, a person is subject to a "handicap" if she or he has a "physical or mental impairment which substantially limits one or more of such person's major life activities, a record of such an impairment, or being regarded as having such an impairment." 42 U.S.C. § 3602(h).

14. The term "physical or mental impairment" includes "alcoholism" and "drug

3

addiction (other than addiction caused by current, illegal use of a controlled substance)." 24 C.F.R. § 100.201. The ADA uses similar terminology to define a "disability." See, e.g., *Tsombanidis v. West Haven Fire Dept.*, 352 F.3d 565 (2d. Cir. 2003).

15.     The legislative history of the proposed amendments to the Fair Housing Act highlights the need to protect individuals in recovery and the absurdity of permitting housing discrimination against recovering alcoholics and addicts:

> [I]ndividuals who have a record of drug use or addiction but who do not currently use illegal drugs would continue to be protected [by the FHA] if they fell under the definition of handicap. The Committee does not intend to exclude individuals who have recovered…or are participating in a treatment program or a self-help group ... Just like any other person with a disability, such as cancer or tuberculosis, former drug-dependent persons do not pose a threat to a dwelling or its inhabitants simply on the basis of status. Depriving such individuals of housing, or evicting them, would constitute irrational discrimination that may seriously jeopardize their continued recovery.

H.R. REP. 100-711, 22, 1988 U.S.C.C.A.N. 2173, 2183.

16.     Under the FHA, it is unlawful to discriminate against or otherwise make unavailable or deny a dwelling to any buyer or renter because of a handicap of that buyer, renter, or person residing in, or intending to reside in, that dwelling after it is sold, rented, or made available. 42 U.S.C. § 3604(f)(1).

17.     The FHA further provides that it is unlawful to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, based on a handicap of such person residing in or intending to reside in that dwelling after it is sold, rented, or otherwise made available. 42 U.S.C. § 3604(f)(2).

18.     The federal regulations implementing the FHA further make it unlawful "to restrict or attempt to restrict the choices of a person by word or conduct in connection with seeking,

negotiating for, buying or renting a dwelling so as to . . . discourage or obstruct choices in a community, neighborhood or development" because of a handicap. 24 C.F.R. § 100.70(a).

19.     The federal regulations implementing the FHA prohibit the provision of municipal services in a different manner based on a handicap and define any such provision of services as a discriminatory activity. 24 C.F.R. § 100.70(d)(4).

20.     The legislative history of the FHA makes plain that Congress sought to prohibit the application of state and local zoning and land use laws in ways that limit access to housing by people with disabilities:

> The Committee intends that the prohibition against discrimination against those with handicaps apply to zoning decisions and practices. The Act is intended to prohibit the application of special requirements through land use regulations, restrictive covenants, and conditional or special use permits that have the effect of limiting the ability of such individuals to live in the residence of their choice in the community.

H. Rep. No. 100-711, at 24 (1988), reprinted in, 1988 U.S.C.C.A.N. 2173, 2185.

21.     The Act prohibits intentional discrimination, the failure of municipal officials to reasonably accommodate the needs of persons with disabilities, as well as the enforcement of zoning laws which, although neutral on their face, have a disparate impact on persons with disabilities.

22.     The ADA requires that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, program, or activities of a public entity or be subjected to discrimination by any municipal entity. 42 U.S.C. § 12132.

23.     The federal regulations implementing the ADA prohibit a public entity from administering a licensing program or establishing certain requirements for the activities of a licensee in a manner that subjects qualified disabled individuals to discrimination on the basis of

5

their disability. 28 C.F.R. § 35.130(6).

24.     The federal regulations implementing the ADA also make it unlawful for a public entity, in determining the site or location of a facility, to make selections that have the purpose or effect of excluding individuals with disabilities, denying them the benefits of certain locations, or otherwise subjecting them to discrimination. 28 C.F.R. § 35.130(4)(I).

## STATEMENT OF FACTS

### A.     Substance Use Disorder[1]

25.     Substance Use Disorders ("SUDs") are treatable, chronic diseases characterized by a problematic pattern of use of a substance or substances leading to impairments in health, social function, and control over substance use.

26.     SUD is a cluster of cognitive, behavioral, and physiological symptoms indicating that the individual continues using the substance despite harmful consequences.

27.     SUDs are treatable, chronic diseases that can affect anyone – regardless of race, gender, income level, or social class.

28.     One in seven Americans aged 12 or older reports experiencing a SUD.

29.     A SUD diagnosis can be applied to the following classes of drugs: alcohol; cannabis; hallucinogens; inhalants; opioids; sedatives, hypnotics, or anxiolytics; stimulants; tobacco (nicotine); and other (or unknown) substances.

30.     SUDs can lead to significant problems in all aspects of a person's life, including at

---

[1] The clinical and statistical information quoted in this section is supported by various clinical studies and community resources. See Substance Use Disorders, Centers for Disease Control and Prevention, https://www.cdc.gov/dotw/substance-use-disorders/index.html; The Science of Addiction, National Institute on Drug Abuse, https://nida.nih.gov/publications/drugs-brains-behavior-science-addiction/treatment-recovery; Show Me Recovery Housing Program, DMH, https://ded.mo.gov/sites/default/files/RHP%20Action%20Plan%2010.7.21%20Public%20Comment%20Draft.pdf.

work, school, or home.

31.     The relapse rate for SUD is approximately 40-60%.

32.     Relapses can be very dangerous and, in many instances, deadly.

33.     According to CDC data, Missouri's 2019 age-adjusted drug overdose death rate was 26.9 per 100,000 individuals compared to the national average of 21.6.

**B.     Recovery Homes[2]**

34.     Recovery housing is designed to address the recovering person's need for a safe and healthy living environment while supplying the requisite recovery and peer support.

35.     Recovery homes, also known as sober homes, are safe, healthy, and sober living environments that support individuals in recovery from substance use disorder and help residents build skills vital to sustaining long-term recovery in a home-like setting.

36.     While recovery residences vary widely in structure, all center on peer support and a connection to services that promote long-term recovery.

37.     Transitioning from active addiction into lasting recovery is often a difficult and emotionally trying journey for people with SUD.

38.     Specifically, the leap from a structured primary treatment environment to the autonomy associated with returning to their former lives in the community can be too great without support.

---

[2] The clinical and statistical information quoted in this section is supported by various clinical studies and community resources. See Recovery Housing: Best Practices and Suggested Guidelines, Substance Abuse and Mental Health Services Administration (SAMHSA), https://www.samhsa.gov/resource/ebp/recovery-housing-best-practices-suggested-guidelines; see also A real-time examination of context effects on alcohol cognitions, Monk RL, & Heim D, https://doi.com/10.1111/acer.12504; Recovery Houses, Missouri Department of Mental Health, https://dmh.mo.gov/media/pdf/recovery-housing-flyer.

39.     The first 12 months of the transitional period before the onset of sustained remission, sometimes referred to as early recovery, is a crucial period during which people contend with family history, unresolved trauma, grief and loss, emotional immaturity, low frustration tolerance, and other factors that make them susceptible to relapse.

40.     Recovery houses are uniquely qualified to assist individuals in all recovery phases, especially early recovery, by furnishing social capital and recovery support.

41.     Community support is a critical aspect of achieving and maintaining recovery.

42.     A support network of individuals not abusing substances, peers with lived experience, trained recovery housing staff, and access to clinical support and community resources is essential to helping people maintain recovery.

43.     Community, camaraderie, empathy, and guidance are necessary to help someone with SUD remain on track as they navigate their way into a healthy recovery lifestyle.

44.     A lack of a stable alcohol- and drug-free living environment can seriously hinder sustained abstinence.

45.     Many individuals who complete substance abuse treatment are released back into the community without the social, psychological, and environmental support needed for long-term recovery.

46.     After-care is essential for increased success in long-term recovery once treatment ends. For many individuals, sober living in a recovery home is the last step between treatment and going home.

47.     Unfortunately, there are not enough recovery home beds in Missouri to meet the community's demand.

C.      **New Beginning's Mission and Program**

48.     In response to the clear need for recovery homes, Plaintiff New Beginning Sanctuary launched a program for sober living homes for recovering alcoholics and addicts who need support transitioning from a rehabilitation program back into society.

49.     NBS has been in operation since August 2013.

50.     NBS's mission is to provide a structured and supportive environment necessary for successful long-term recovery from substance and alcohol use by offering multiple pathways that empower participants to become healthy, self-sufficient, and productive members of the community.

51.     NBS is a certified recovery housing provider by the National Association of Recovery Residences ("NARR"). NARR establishes the national standard for recovery residences and only certifies affiliates that meet that standard.

52.     NBS operates 12-month or more sober living programs, including faith-based and secular recovery programs.

53.     NBS operates 25 recovery homes across the state of Missouri.

54.     Residents move into NBS recovery homes to stabilize and strengthen their sobriety foundation. Over time, they start to restore relationships with family and friends.

55.     NBS's sober living program provides daily structure, personal accountability, and community support needed to maintain sobriety.

56.     NBS's program combats the relapse rate by relying heavily on accountability and support.

57.     To ensure residents of the home are sober, NBS also employs both scheduled and random drug testing.

58.     In these scheduled and random tests, NBS uses various drug panel tests (6, 12, and

18-panel tests), blood alcohol readers (BAC), a 72-hour alcohol test (ETG), and fentanyl test strips, among other things. NBSs also has a narcotics K9 specifically trained to detect illicit drugs.

59.   If any resident fails a substance test or refuses to participate in a required test, NBS requires them to vacate the recovery home.

60.   NBS' program rules require the residents to complete a daily chores list. Residents must keep their areas neat, clean, and well-organized. In addition, they clean the home's common areas, both inside and outside, daily. They also participate in weekly neighborhood clean-up events.

61.   All NBS residents must be out of bed by 6 A.M. and remain so until 3 P.M. Monday through Friday unless authorized by a staff member.

62.   NBS residents who do not work must leave the recovery home by 8 A.M. in search of employment and turn in at least five applications daily before returning home.

63.   If a resident receives Social Security Disability or any other Disability payment and is unemployed, they must be up between 8 A.M. and 3 P.M. to ensure active participation in their recovery.

64.   Residents must attend at least three scheduled meetings/groups per week, including at least one sobriety/support-related (i.e., Alcoholics Anonymous, Narcotics Anonymous) meeting.

65.   Residents must also attend the mandatory classes outlined by NBS's staff and the weekly house meeting.

66.   Each resident is subjected to a nightly curfew and is not permitted to leave the recovery home overnight unless they have earned the privilege of an overnight pass.

67.   The program rules and chores requirements exist so the residents can learn to

function as sober individuals in a family environment before returning home.

### D.     1635 W KATELLA STREET

68.     In March 2018, NBS signed a lease with JAAM Properties, LLC, to occupy a private residence at 1635 W Katella Street in Springfield, MO. NBS leased the property to use as a recovery home.

69.     NBS also leases 1629 West Katella in Springfield from JAAM, which it uses as a recovery home.

70.     Both of these homes are located in an R-SF zone.

71.     Both recovery homes should house at least ten residents: comprising of at least eight program members and two House Leaders.

72.     House Leaders provide structure and accountability to the residents and ensure compliance with the house rules.

73.     1635 W Katella Street is approximately 2,087 square feet and has four bedrooms, a spare room, and two full baths.

74.     The home is meant to look like any other home. From the outside of the home, you would never know it is a sober living home.

75.     NBS does not accept residents at 1635 W Katella Street or any of its recovery homes unless they are in recovery from alcohol or drug abuse.

76.     All past and present residents of 1635 W Katella Street are individuals with a SUD.

77.     SUD is a disability that impacts the residents' decision-making processes and ability to concentrate and stay on task.

78.     Because of their disability, all past and present residents have difficulty caring for themselves and sustaining healthy relationships with friends and family.

79.     Even though residents are actively in recovery, their underlying addictions substantially limit their ability to live independently in the community without suffering a relapse.

80.     While treatment eventually helps to ameliorate the symptoms of SUD, the underlying disease never goes away.

81.     The relapse rate for individuals with SUD is significant without structure, accountability, and support.

82.     The residents live at 1635 W Katella Street by choice. The residents choose to live there because they do not want to relapse into drug or alcohol use again.

83.     1635 W Katella Street is not a lockdown facility. NBS requires residents to work, both paid and volunteer, and attend classes, groups, meetings, and/or church services regularly. Each resident's schedule is highly structured and contains strict daily and weekly chore requirements.

84.     1635 W Katella Street residents live together as a family and make group decisions based on democratic procedures.

85.     They eat, go out, do weekly neighborhood cleanups, and attend meetings together.

86.     The residents learn living tools through their interactions with each other to help them transition out of the sober home and back into their communities.

87.     The residents' mutual emotional support and bonding are equivalent to the love and support received in a traditional family.

88.     The relationships the 1635 W Katella Street residents maintain are vital to their sobriety.

89.     The success of each resident is highly dependent on community, structure, and support.

90.     The length of each resident's stay is determined by the resident's continued need for supported living.

91.     Most residents stay approximately 12 months, but some lengths vary depending on the resident's independent recovery process.

92.     NBS enables the residents to recover from alcoholism and substance abuse at their own pace, which ameliorates the effects of the disease.

### E.      Critical Mass

93.     1635 W Katella Street requires at least ten residents to reach the critical mass necessary to achieve the therapeutic purpose of NBS's program.

94.     1635 W Katella Street requires at least ten residents to effectively provide residents with increased social support, which is necessary to enable residents to overcome addiction.

95.     Having at least ten residents in 1635 W Katella Street increases opportunities for social connections, which sustains recovery and decreases in the risk of relapse.

96.     Each resident comes to NBS's program with their own experiences and personality. Operating a program with at least ten people increases the likelihood that the residents will find another program member with whom they can connect.

97.     1635 W Katella Street, which is 2,087 square feet and has four bedrooms and a spare room, requires at least ten residents to prevent isolation or loneliness.

98.     Filling the home to its critical mass of at least ten residents mitigates the concern that any particular resident will find himself at home alone and at risk of relapse.

99.     For the program to function optimally, the residents must share a room to ensure accountability and social integration. As such, 1635 W Katella Street requires at least ten residents for each resident to share a room.

100.     It costs NBS approximately $7,000 to $8,000 a month to run 1635 W Katella Street. This sum includes the mortgage payment, taxes, insurance, internet and cable, utilities, trash, pest service, and a portion of staff salaries. This sum also includes some savings set aside each month for improvement projects and unexpected home expenses.

101.     NBS requires the occupancy of at least ten residents to achieve financial viability.

     F.     **Springfield's Zoning Enforcement**

102.     The City's Zoning Code governs zoning and land use policy in Springfield, Missouri.

103.     On August 18, 2023, the City cited NBS and JAAM, asserting Plaintiffs violated Section 36-465(2):

> The group home does not meet the location requirements due to another licensed group home being located within one quarter mile of this address. To comply, cease and desist the unlawful operation of a group home at this address.

104.     The City first identified 1635 West Katella Street as a Group Home, which is defined as a type of Group Living Facility by 36-321. of the Zoning Code as follows:

> A single-family-detached dwelling in which no more than ten people reside, comprised of the following: eight or fewer unrelated mentally or physically handicapped persons, no more than two persons acting as houseparents or guardians who need not be related to each other or to any of the mentally or physically handicapped persons, residing in the dwelling, and the children of the houseparents or guardians.

105.     The City's ordinance prohibits multiple group homes based on a Zoning Code 36-465:

> (1)     *Purpose.* It is necessary and desirable to provide suitable sites for residential group homes, as defined in section 36-321, definitions, in single-family residential areas provided that, in furtherance of the goals of de-institutionalization of handicapped persons and allowing residential group homes to be integrated throughout the community, residential group homes are not concentrated in particular neighborhoods.

14

(2) *Residential group home location requirement.* Residential group homes are permitted in the R-SF, R-TH, and R-MHC districts provided that no residential group home shall locate within a one-quarter mile radius of another residential or custodial group home.

106.     On August 21, 2023, Plaintiffs advised the City by letter that the 1635 West Katella Street residents are disabled under the FHA and ADA and, therefore, protected by the same.

107.     Plaintiffs further advised the City that NBS was operating recovery homes at 1635 West Katella and not group homes as determined by the City.

108.     Plaintiffs asked the City to grant reasonable accommodation pursuant to the FHA and ADA and to treat NBS's use of the homes as a single-family use.

109.     Plaintiffs also informed the City that excluding individuals in recovery from drug and alcohol addiction from its definition of Group Home discriminated based on disability type.

110.     For instance, the Zoning Code permits a Group Home for people with disabilities to live "as-of-right in all districts that allow household living uses" but severely limits where individuals with a SUD can live.

111.     On August 30, 2023, Plaintiffs requested in writing reasonable accommodation by submitting the request to the Director of Building Services.

112.     On September 28, 2023, the City denied Plaintiffs' request for reasonable accommodation.

113.     The opposition primarily takes the form of fears based on stereotypes of individuals with substance use disorder and unsubstantiated claims of property devaluation and safety concerns.

114.     The opposition essentially stated that sober homes might be necessary – just not in their backyard.

**CAUSES OF ACTION**

15

<u>COUNT ONE: FAIR HOUSING ACT:</u>
<u>Failure to Accommodate</u>

115.    The allegations listed above are incorporated herein by reference.

116.    Plaintiffs performed or participated in all conditions precedent to the filing of this complaint.

117.    1635 W Katella Street meets the definition of "dwelling" within the meaning of 42 U.S.C. § 3602(b).

118.    The residents of the home are "handicapped" within the meaning of 42 U.S.C. § 3602(h).

119.    The residents of the home are regarded as "handicapped" within the meaning of 42 U.S.C. § 3602(h).

120.    Defendant has acted under color of the law of the State of Missouri, enforcing the Code with the purpose and effect of discriminating against Plaintiffs and the residents solely because of their handicap and disability.

121.    Defendant's actions described above constitute the following:

        a.      discrimination in the sale or rental, or otherwise making unavailable or denying a dwelling because of disability in violation of the FHA, 42 U.S.C. §3604(f)(1);

        b.      a refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford a person an equal opportunity to use and enjoy a dwelling in violation of the FHA, 42 U.S.C. §3604(f)(3)(B); and

        c.      interference with the rights of persons in the exercise or enjoyment of, or on account of their having exercised or enjoyed, or on account of their having

aided or encouraged persons with disabilities in the exercise of enjoyment

of rights granted or protected by the FHA in violation of 42 U.S.C. §3617.

122.   Defendant's actions described above were intentional and taken with willful disregard for Plaintiffs' rights.

123.   Plaintiffs are aggrieved persons, as defined in 42 U.S.C. § 3602(i), who have suffered economic loss, emotional distress, and loss of their civil rights as a result of Defendant's conduct.

124.   Plaintiffs are without an adequate remedy at law.

125.   Plaintiffs will suffer irreparable harm if Defendant refuses to grant their requested accommodation to permit continued operation of 1635 W Katella Street.

126.   WHEREFORE, Plaintiffs pray that this Court enter an ORDER:

    a.   Declaring the Defendant's actions violate the Fair Housing Act;

    b.   Granting a preliminary and permanent injunction enjoining Defendant to grant Plaintiffs' request for a reasonable accommodation or whatever action necessary to permit continued operation of 1635 W Katella Street and to refrain from eviction proceedings against residents of the 1635 W Katella Street during the pendency of this proceeding;

    c.   Awarding Plaintiffs such damages as would fully compensate them for their injuries caused by Defendant's discriminatory housing practices, including compensatory and punitive damages;

    d.   Awarding Plaintiffs their costs, expenses, and attorney's fees; and

    e.   Granting any additional relief as the Court deems just and proper.

COUNT TWO: FAIR HOUSING ACT
Disparate Treatment

17

127.    The allegations listed above are incorporated herein by reference.

128.    The City Zoning Code and related city statutes and regulations illegally discriminate against individuals with disabilities and those associated with them in violation of the Fair Housing Act. Further, the Zoning Code illegally discriminates based on type of disability because the City treats individuals with SUD differently than other types of disability.

129.    WHEREFORE, Plaintiffs pray that this Court enter an ORDER:

    a.      Declaring the Defendant's actions violate the Fair Housing Act;

    b.      Granting a preliminary and permanent injunction enjoining Defendant from enforcing the discriminatory sections of the Zoning Code, including, but not limited to, the Code's exclusion of individuals in recovery from alcohol and drug addiction from its definition of Group Home;

    c.      Awarding Plaintiffs such damages as would fully compensate them for their injuries caused by Defendant's discriminatory housing practices, including compensatory and punitive damages;

    d.      Awarding Plaintiffs their costs, expenses, and attorney's fees; and

    e.      Granting any additional relief as the Court deems just and proper.

COUNT THREE: FAIR HOUSING ACT<br>Disparate Impact

130.    The allegations listed above are incorporated herein by reference.

131.    The City Zoning Code and related city statutes and regulations illegally discriminate against individuals with disabilities and those associated with them in violation of the FHA because, even if facially neutral, they have the effect of reducing the housing opportunities available to individuals with disabilities and segregating the same from the community.

132.    WHEREFORE, Plaintiffs pray that this Court enter an ORDER:

a.    Declaring the Defendant's actions violate the Fair Housing Act;

b.    Granting a preliminary and permanent injunction enjoining Defendant from enforcing the discriminatory sections of the Zoning Code;

c.    Awarding Plaintiffs such damages as would fully compensate them for their injuries caused by Defendant's discriminatory housing practices, including compensatory and punitive damages;

d.    Awarding Plaintiffs their costs, expenses, and attorney's fees; and

e.    Granting any additional relief as the Court deems just and proper.

COUNT FOUR: AMERICANS WITH DISABILITIES ACT

133.    The allegations listed above are incorporated herein by reference.

134.    The residents of the home are "qualified individuals with a disability" within the meaning of 42 U.S.C. § 12131(2) and 28 C.F.R. § 35.104.

135.    The residents of the home are "regarded as" individuals with a disability within the meaning of 42 U.S.C. § 12131(2) and 28 C.F.R. § 35.104.

136.    Defendant is a "public entity" within the meaning of 42 U.S.C. § 12131(1).

137.    Defendant's zoning activities, including the enactment of zoning ordinances; administrative processes, hearings, findings, and recommendations by either its Zoning Administrator or its Planning and Zoning Commission; and decisions by the BZA, are "services, programs, or activities" of a public entity within the meaning of 42 U.S.C. § 12132.

138.    Defendant's actions described above:

a.    constitute discrimination in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. Part 35;

19

b.        exclude qualified individuals with disabilities from participation and deny them the benefits of the services, programs, or activities of a public entity on the basis of disability in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(a);

c.        afford qualified individuals with disabilities an opportunity to participate in or benefit from the services of a public entity that are not equal to those afforded others in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(b)(1)(ii);

d.        otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(b)(1)(vii);

e.        fail to make reasonable modifications in policies, practices, or procedures necessary to avoid discrimination on the basis of disability in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(b)(7);

f.        utilize methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(b)(3);

g.        exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association

in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(g); and

h.     interfere with an individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the ADA in violation of Title V of the ADA, 42 U.S.C. § 12203(b)

139.     Defendant's actions described above were intentional and taken with willful disregard for Plaintiffs' rights.

140.     Plaintiffs are "person[s] alleging discrimination on the basis of disability" within the meaning of 42 U.S.C. § 12133 who have suffered harm and damages by Defendant's actions described above.

141.     Plaintiffs are without an adequate remedy at law.

142.     Plaintiffs will suffer irreparable harm if Defendant refuses their request for reasonable accommodation to allow continued operation of 1635 W Katella Street.

143.     WHEREFORE, Plaintiffs pray that this Court enter an ORDER:

a.     Declaring the Defendant's actions violate the Americans with Disabilities Act and its implementing regulations;

b.     Granting a preliminary and permanent injunction enjoining Defendant to grant Plaintiffs' request for a reasonable accommodation or whatever action necessary to permit continued operation of 1635 W Katella Street and to refrain from eviction proceedings against residents of the 1635 W Katella Street during the pendency of this proceeding;

c.       Awarding Plaintiffs such monetary damages as would fully compensate them for their injuries caused by Defendant's discriminatory housing practices;

d.       Awarding Plaintiffs their costs, expenses, and attorney's fees; and

e.       Granting any additional relief as the Court deems just and proper.

**JURY DEMAND REQUESTED.**

Date: October 30, 2023                  Respectfully submitted,

By:    <u>/s/ *Sarah Jane Hunt*     </u>
Sarah Jane Hunt (63899MO)
Michelle Faron (68058MO)
KENNEDY HUNT, P.C.
4500 West Pine Blvd.
St. Louis, MO 63108
Phone: (314) 872-9041
Fax: (314) 872-9043
<u>sarahjane@kennedyhuntlaw.com</u>
<u>michelle@kennedyhuntlaw.com</u>

**Attorneys for Plaintiffs**